RECORD NO. 13-4323

IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

JERMAINE D. DICKERSON,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT HUNTINGTON

**OPENING BRIEF OF APPELLANT
JERMAINE D. DICKERSON**

Steven Michael Bragg
THE LAW OFFICE OF STEVEN M. BRAGG
Suite 123
6007 Route 60 East
Barboursville, WV 25504
(304) 523-3900
steve@smbragg.com

*Counsel for Appellant*                                    July 3, 2013

LANTAGNE LEGAL PRINTING 801 East Main Street Suite 100 Richmond, Virginia  23219 (804) 644-0477
A Division of Lantagne Duplicating Services

TABLE OF CONTENTS

TABLE OF AUTHORITIES                                        ii, iii

STATEMENT OF SUBJECT MATTER AND
     APPELLANT JURISDICTION                          1

STATEMENT OF THE CASE                                      1

STATEMENT OF FACTS                                         3

SUMMARY OF ARGUMENT                                        10

ARGUMENT                                                   10

     I. WHETHER THE DISTRICT COURT ERRED BY COMPUTING
       RELEVANT  CONDUCT WITHOUT A SUFFICIENT INDICIA
       OF RELIABILITY                                  11

     II. WHETHER THE DISTRICT COURT ERRED IN ENHANCING
       THE DEFENDANT'S OFFENSE LEVEL FOR A LEADERSHIP
       ROLE                                            16

CONCLUSION                                                 18

CERTIFICATE OF COMPLIANCE                                  20

CERTIFICATE OF FILING AND SERVICE                          21

TABLE OF AUTHORITIES

CASES:                                                          PAGE

United States v. Cameron, 573 F. 3d 179, 184 (4th Cir. 2009)    16,17,18,19

United States v. Correa-Alicia, 585 F. 3d 484 (1st Cir. 2009)   11

United States v. Culps, 300 F. 3d 1069, 1079, n.5 (9th Cir. 2002)  12

United States v. Hayes, 482 F. 3d 749 (4th Cir. 2007)           13

United States v. Hickman, 626 F. 3d 756, 769 (4th Cir. 2010)    11,13

United States v. Howard, 80 F. 3d 1194, 1204 (7th Cir. 1996)    12

United States v. Sampson, 140 F. 3d 585, 592 (4th Cir. 1998)    11, 15

United States v. Sayles, 296 F. 3d 219 (4th Cir. 2002)          17

United States v. Stark, 8 F. 3d 822 (4th Cir. 1993)             12

United States v. Thorson, 633 F. 3d 312, 317 (4th Cir. 2011)    11

United States v. Uwaeme, 975 F. 2d 1016, 108 (4th Cir. 1992)    11
        (quoting 18 U.S.C. § 3742(e)).

United States v. Walton, 908 F. 2d 1289, 1302 (6th Cir. 1990)   13
cert. denied ____ U.S. ____, 130 S.Ct. 1909, 176 L. Ed. 2d 384
(2010)                                                             13


STATUTES and RULES:

18 U.S.C. § 3231                                                  1
18 U.S.C. § 3742                                                  1, 11
21 U.S.C. § 846                                                   1, 2

| OTHER AUTHORITIES: | PAGE |
|---|---|
| U.S.S.G. § 2D1.1 | 11 |
| U.S.S.G.§3B1.1 | 10,16,18 |
| U.S.S.G. § 6A1.3 | 11 |

## STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

This appeal arises from the Defendant's sentencing after his plea to a single count information. The United States District Court for the Southern District of West Virginia had subject matter jurisdiction pursuant to 18 U.S.C. § 3231 and the controlled substance offense charged in the information, 21 U.S.C. § 846. The Fourth Circuit Court of Appeals has jurisdiction pursuant to 18 U.S.C. § 3742, and Rules 3 and 4 of the Federal Rules of Appellate Procedure. The Judgment and Commitment Order was entered on March 28, 2013. The Defendant's Notice of Appeal was filed April 25, 2013.[1]

## STATEMENT OF THE CASE

The Defendant was indicted in the Southern District of West Virginia on August 29, 2012, in an eight count, Third Superseding Indictment, along with co-Defendant, Kevin Robinson. (Joint Appendix p. 29). The five counts against this Defendant included a conspiracy charge with Kevin Robinson named as a co-conspirator to distribute a quantity of heroin and 280 grams or more of cocaine base, another count of distribution of cocaine base, another count of distribution heroin, another count of aiding and abetting the sale of cocaine base and another count of aiding and abetting the sale of heroin.

[1] Jermaine Dickerson and Kevin Robinson were co-defendants and are appealing on the same grounds, most of the content in this brief is the work of Robinson's counsel, Michael Frazier, Esquire and is being used with his permission.

Both Defendants elected to proceed to a jury trial, which began December 11, 2012. On the third day of trial, December 13, 2012, Defendant was offered, and he accepted, a plea to a one count information, charging him with conspiracy to distribute a quantity of heroin, and 28 grams or more of cocaine base, in violation of 21 U.S.C. § 846. (Joint Appendix p. 407, 448). Sentencing was set for March 25, 2013, and by order entered December 13, 2012, the government was directed to provide a matrix of relevant conduct it intended to rely on for sentencing.

The United States Probation Department prepared a sentencing report that recommended a total offense level of 34, with Criminal History Category of VI, resulting in a recommended range of 262 – 327 months (Joint Appendix p. 600). On or about February 25, 2013, Defendant filed objections to the presentence report, mostly dealing with objections to the government's calculation of relevant conduct. At sentencing March 25, 2013, United States District Judge Robert Chambers granted some objections, and ultimately found Defendant to have a base offense level of 30, in Category VI. The judge sentenced Defendant to the high end of the recommended guideline range, 189 months (Joint Appendix p. 585). Defendant filed a motion to file notice of appeal outside the time limit and an order was entered allowing Defendant to file outside the time limit (Joint Appendix p.

596).   Timely notice of appeal was filed on April 25, 2013 (Joint Appendix p. 597).

## STATEMENT OF FACTS

Defendant and his co-Defendant were charged with conspiracy to distribute a quantity of heroin, and distributing in excess of 280 grams of cocaine base, from the Fall of 2010 to in or around July, 2011.  That charge was contained in Count I of the Third Superseding Indictment. Count  II – VII  were  individual sales by one or both Defendants within the conspiracy period.

The evidence established that Defendant and Mr. Robinson worked together at times.  Some witnesses testified they could call a cell number and either would answer and take orders. (Joint Appendix p. 387).  Both Defendants were seen operating a red vehicle, sometimes together, sometimes separately. (Joint Appendix p. 294).  At their pleas, this Defendant readily acknowledged conspiring with Mr. Robinson to distribute narcotics. (Joint Appendix p. 428).

Issues in this appeal arise from the quantity of drugs involved in the conspiracy, upon which Defendants' sentences were computed.  Pursuant to the government matrix, the government initially sought to use two different areas as relevant conduct for this Defendant: 1) weight based on the testimony of Jonathan McDonald, an uncharged co-conspirator, and 3) drugs found at 1231 West Fifth Avenue during a search July 7, 2011.

3

At sentencing, the court ultimately found that any drugs seized from 1231 West Fifth Avenue would not be used for relevant conduct. The court found the government presented evidence such that one could infer the drugs at that location belonged to this Defendant, "but an inference alone isn't enough to establish a preponderance of the evidence" (Joint Appendix p. 547). Ultimately, the court found the government had not "met its burden" of proof (Joint Appendix p. 547). Thus, all Defendant's relevant conduct was based on the trial testimony of Jonathan McDonald. (Joint Appendix p. 547). Jonathan McDonald testified he went on trips to Columbus, Ohio to purchase narcotics for this Defendant. Jonathan McDonald was himself a user, but believed Defendant let him drive because he was white and had a valid driver's license. (Joint Appendix p. 283).

The government asserts that sometime in October 2010, on a trip to Columbus, Kevin Robinson introduced Jonathan McDonald to the Defendant. (Joint Appendix p. 268). McDonald testified the trips occurred "once or twice a week", beginning after the Defendants began staying at 1231 West Fifth Avenue. (Joint Appendix p. 280, 281). And he continued making these trips until he and the Defendant had a falling out, which he testified was "about 5 months before" Kevin Robinson was arrested on June 29, 2011 (Joint Appendix p. 298).

Thus, for relevant conduct purposes the judge needed to know when the trips to Columbus started, when they ended, how often they occurred, and how much

4

drugs were obtained on each trip. As to when the trips started, the testimony was unclear. Although the government asserts October of 2010, that month is based entirely off of a question presented to Jonathan McDonald by the Assistant United States Attorney: "I want you to focus your attention around the month of October of 2010" (Joint Appendix p. 267). While Jonathan McDonald admittedly went along with the prosecutor, nothing else points to the trips beginning that early. Jonathan McDonald testified that after the trip where he met the Defendant, the two Defendants stayed "between Chesapeake and Guyandotte" for 2 – 3 weeks. (Joint Appendix p. 277). After this "three week period", Jonathan McDonald testified the Defendant moved to 1231 West Fifth Avenue. (Joint Appendix p. 278, 279). Thus, if the October date is to be believed, the Defendants were occupying 1231 West Fifth Avenue by about Thanksgiving, 2010.

Defendant notes that none of the controlled buys contained in Counts II – VII occurred before March of 2011, and discovery produced no evidence of activity before then. Counsel for Kevin Robinson produced evidence at sentencing from West Virginia American Water Company, showing water was shut off at the W. Fifth Avenue location from August 2010 until March 23, 2011. (Joint Appendix p. 466). Similarly, witness Tessa Vinson testified she met Defendants in February of 2011, and thereafter they moved to West Fifth Avenue (Joint Appendix p. 379,380). But for the prosecutor mentioning October of 2010, there is

no <u>evidence</u> supporting the trips beginning that early, but plenty of evidence suggesting it was months later.

It is similarly unclear when the trips ended.  Although the government's matrix projected through March 2011, it presented evidence at sentencing tending to show that Jonathan McDonald was still involved in the conspiracy as late as mid-April, 2011.  (Joint Appendix p. 487).  But while Jonathan McDonald may have still been involved with Defendants that late, he testified the trips to Columbus stopped "about 5 months before Kevin was arrested."  (Joint Appendix p. 298).  That would be about the end of January, 2011.  Jonathan McDonald, upon prodding from the government, later amended his answer to "3 to 5 months" (Joint Appendix p. 298), which could take it into March.   He finally asserted "it was several months before Kevin Robinson got arrested" (Joint Appendix p. 301).

The frequency of the trips is apparently based on one statement Jonathan McDonald made, that the trips occurred "once or twice a week" over the undefined period. (Joint Appendix p. 280,281).  And he admits that "sometimes we'd go up there and wouldn't be able to find no dope, have to come back empty-handed." (Joint Appendix p. 281).  When pressed, he recalled that happening "maybe twice" (Joint Appendix p.282), but the only certain fact is that it did occur at least "sometimes."

The final factor in the relevant conduct equation is the amount of drugs procured.  Virtually all of the weight placed on these Defendants comes from the court's guesswork concerning Jonathan McDonald's testimony.  Jonathan McDonald guessed they would pick up 2-5 ounces of heroin, and 2-5 ounces of powder cocaine, on each successful trip to Columbus. (Joint Appendix p. 281,282).  The court ultimately found those amounts "not credible" (Joint Appendix p. 551).  But he testified on only <u>one</u> occasion did he actually see the drugs, and it was "I believe…a quarter ounce of heroin and around a half ounce of cocaine". (Joint Appendix p. 269).  Later, he admitted this was guesswork, but was accurate "give or take a couple grams." (Joint Appendix p. 271).

Defendant believes the fallacy of Jonathan McDonald's guesswork is best seen by trying to figure sales.  Jonathan McDonald testified it took the group 4-5 days to sell two ounces of heroin. (Joint Appendix p. 323).  That would be 56 grams of the drug.  Each sale was for 2/10 to ½ gram. (Joint Appendix p. 292).  Assuming the smaller size, that means these Defendants had about 280 doses of heroin to sell, or, over 4 days, 70 doses <u>each</u> <u>day</u>.  Obviously, these figures would go up significantly if the count were to use an amount between 2-5 ounces.

Yet Jonathan McDonald also testified the high number of sales made by this group was "around 20 or 30" at the beginning of the month, but often only 4-5 a day.  (Joint Appendix p. 292).  This discrepancy is compounded when one figures

7

the Defendants would lose most of a day (if not more) driving to and from Columbus, converting powder to crack, packaging the drugs, etc.  Thus, Defendant believes Jonathan McDonald testimony clearly lacks any "indicia of reliability."

At sentencing, the court imposed a 2 level enhancement for a leadership role on both Defendants.  (Joint Appendix p. 577).  The court based this in large part on Jonathan McDonald's testimony: "they enlisted Mr. McDonald to do the driving…"; "they also enlisted Mr. McDonald to consummate sales for them…" (Joint Appendix p. 544).  It also found Mr. Pemberton and Miss Vinson credible, and asserted the enhancement was appropriate because they worked with these Defendants to help distribute drugs (Joint Appendix p. 544).

Finally, the court admittedly was troubled by the amount of weight attributable through Jonathan McDonald.  The court found his testimony credible "to establish his connection to them and their conspiracy" (Joint Appendix p. 548), but was not satisfied his testimony could prove, by a preponderance "the drug quantity that was found in the presentence report or that's recommended by the government." (Joint Appendix p. 549).

The court, *sua sponte*, then began a calculation on its own to establish relevant conduct.  It first found sufficient credibility to establish Jonathan McDonald started dealing with these Defendants "in October…when he got a quarter ounce of heroin and a half an ounce of cocaine powder." (Joint Appendix

8

p. 549).  As to the end of his involvement, the court states "it's clear that he was still involved in April." (Joint Appendix p. 550).  Defendant believes it was error to confuse this Defendant and Mr. McDonald still being "involved", when the real issue (in determining weight) was over what period the trips to Columbus were occurring.

The amounts, however, gave the court more concern than the time span.  "So the court finds it not credible to conclude that each week these two gentlemen were involved in dealing at least…2 ounces of heroin and 2 ounces of cocaine powder converted to crack cocaine." (Joint Appendix p. 551).  But the court then made a statement upon which it based it's faulty computations: "[W]hen they went to Columbus and got drugs every week, they got at least as much as they got the first time, a quarter ounce of heroin, a half an ounce of cocaine powder." (Joint Appendix p. 552).

Later, it indicated it was attributing drugs at this rate "into June" (Joint Appendix p. 553), even though Jonathan McDonald and his trips ended at least by April, if not earlier.  When sentencing this Defendant, the court attributed this weight "over a period of 30 weeks." (Joint Appendix p. 576).  Based on all its estimations, the court ultimately found this Defendant accountable for the equivalent of 700 – 1000 kilograms of marijuana, or a base offense level of 30. (Joint Appendix p. 576).

Defendant's sentence was enhanced by the leadership role to a level 32, and then reduced back to 30 for acceptance of responsibility. (Joint Appendix p. 577). After arguments from counsel and allocution, the court sentenced Defendant to 189 months, in the middle of the guideline range of 168-210 months. (Joint Appendix p. 585).

## SUMMARY OF ARGUMENT

Defendant alleges the district court committed clear error by improperly calculating the drug weight attributable to him.  The court did so by a) improperly starting with the assumption that each trip "was at least" bringing home ½ ounce of cocaine and ¼ ounce of heroin; b) improperly finding the trips began at the beginning of October, when the evidence was vague and at best should have been the end of October; and c) by improperly finding the trips went through June.

The Defendant also alleges the district court committed clear error by imposing the leadership enhancement of USSG 3B.1.1.

## ARGUMENT

### Standard of Review

The standard of review for both arguments is clear error.  "In reviewing sentences imposed under the Guidelines, we must give 'due regard to the opportunity of the district court to judge the credibility of the witnesses, and shall accept the findings of fact of the district court unless they are clearly erroneous'"

10

United States v. Uwaeme, 975 F. 2d 1016, 108 (4th Cir. 1992) (quoting 18 U.S.C. § 3742(e) ).  Likewise, whether a role in the offense enhancement is proper is a factual determination, which is reviewed on appeal for clear error.  United States v. Thorson, 633 F. 3d 312, 317 (4th Cir. 2011)

I.    THE  DISTRICT  COURT  COMMITTED  CLEAR  ERROR  BY IMPROPERLY   CALCULATING DEFENDANT'S RELEVANT CONDUCT

There is no question that a district court may "approximate the quantity [of drugs]  to  be used  for sentencing." U.S.S.G. § 2D1.1, comment (n.12); United States v. Sampson, 140 F. 3d 585, 592 (4th Cir. 1998).  However, the court must still base its approximation on information that "has sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3.

Indeed, "[u]nder more than two decades of federal law, it is impermissible to enhance drug amounts without particularized evidence of narcotic transaction." United States v. Hickman, 626 F. 3d 756, 769 (4th Cir. 2010).  Drug quantity extrapolations have been allowed, but the courts must use "highly conservative" estimates.  United States v. Correa-Alicia, 585 F. 3d 484 (1st Cir. 2009), cert. denied ____ U.S. ____, 130 S.Ct. 1909, 176 L. Ed. 2d 384 (2010).  As the Hickman court concluded, conservative extrapolation is allowed, but cannot go "so far as to fabricate transactions of which there is no evidence."  Hickman, supra, at 769.

Clearly, when the amount of drugs is in dispute (as here), the government must prove the amount by a preponderance of the evidence, and the district court must make an independent resolution of the issue at sentencing. See, e.g. United States v. Stark, 8 F. 3d 822 (4th Cir. 1993). Here, the court specifically found the government's evidence did not prove its theory. (Joint Appendix p. 607). The court, however, then engaged in estimation of its own creation.

Estimation, even if it is conservative, still must be supported by reliable information. See, e.g., United States v. Howard, 80 F. 3d 1194, 1204 (7th Cir. 1996). And the absence of evidence cannot be overcome "by adopting a conservative estimate." United States v. Culps, 300 F. 3d 1069, 1079, n.5 (9th Cir. 2002). That is precisely what transpired here.

The court found Jonathan McDonald credible, but only as to establishing he was involved in a conspiracy with these Defendants. The court specifically did not find him credible as to drug weights. That is not surprising, since he testified he only saw drugs on the trips once, and he only acted as driver, essentially staying in the hotel room while Defendants went in search of drugs. And even the amount he says he saw was tenuous: "I believe it was a quarter ounce of heroin, and around a half ounce of cocaine…give or take a couple of grams." (emphasis added) (Joint Appendix p. 271). A "couple grams" takes a quarter ounce from 7 grams to 5, a 28½% difference.

12

The district court attempted to overcome this vagueness by declaring the Defendants "got at least as much [on subsequent trips] as they got the first time, a quarter ounce of heroin, a half an ounce of cocaine powder." This declaration however, which serves as the linchpin of the court's calculations, is nothing but a guess, and clearly is not based on any "hard" evidence. And when "choosing between a number of plausible estimates of drug quantity…a court must err on the side of caution." Hickman, supra, at 679, quoting United States v. Walton, 908 F. 2d 1289, 1302 (6th Cir. 1990).

Since Jonathan McDonald testified he "believes" the Defendant bought "around" a quarter ounce of heroin and a half ounce of cocaine that first trip, "give or take a couple of grams," it was clear error for the court to then use the highest possible estimation as a basis for calculation. Similarly, the court clearly erred in establishing the length of Jonathan McDonald's involvement. Even assuming his testimony was credible that the first meeting was in October of 2010, since no date was specified such an ambiguity required the court to establish the start of the trips at the end of October. See, e.g. United States v. Hayes, 482 F. 3d 749 (4th Cir. 2007) (re: the use of the "rule of lenity".)

Jonathan McDonald then testified it was after a "three week period" that the weekly trips began, or by approximately November 21, 2010. They continued until Jonathan McDonald had a falling out with the Defendant. According to

13

Jonathan McDonald, he stopped his involvement "about 5 months before Kevin got arrested." Kevin Robinson was arrested June 29, 2011, so that would be by January 29, 2011. Even after the government rehabilitated McDonald, he said it was "3-5 months" before the arrest. Defendant argues the rule of lenity, again, required the court to use the 5 month estimate. From November 21, 2010 till January 29, 2011 is only about 10 weeks.

Defendant acknowledges the government showed a video at sentencing showing McDonald driving Defendant's car in April of 2011. But the weight used by the court was based on the number of trips to Columbus McDonald says he took to buy drugs for Defendants. By his own testimony, those trips ceased in late January to late March. The fact that he was still involved with Defendants in April may show his involvement in the conspiracy, but it should not have been used to estimate relevant conduct based on trips that ceased weeks previously.

The court ultimately found the conspiracy involving Jonathan McDonald extended for 36 weeks. (Joint Appendix p. 576). But assuming the end of October is used as required, there were only 32 weeks available in that period. The district court obviously used the entire month of October, which is in itself clear error. Defendant also believes it was clear error to extend the same weekly amounts past the time Jonathan McDonald left the conspiracy, be that January or March.

The court then determined there "were at least 6 of those weeks where they did not make a purchase" (Joint Appendix p. 576). While Defendant appreciates the court finding that many, the only evidence from Jonathan McDonald was that that happened at least twice. Again, the district court created estimates that were not based on any evidence, or even reasonable assumptions.

The faulty estimates had a huge effect on this Defendant's sentencing. Had the court used 10 weeks, Defendant would have been attributed 7 grams of heroin, and 140 grams of cocaine, or a total of 35 kilograms of marijuana, a Level 18 base offense level, with a suggested range (in Criminal History Category VI) of 57 – 71 months before any adjustments. And had the court used the lesser quantities ("give or take a couple of grams") the result would be even lower.

Finally, the Fourth Circuit has cautioned that when calculation of drug quantity is based on "uncertain" evidence, district courts should sentence at the low end of the applicable Guidelines range. United States v. Sampson, 140 F. 3d 585, 592 (4th Cir. 1998). As noted earlier, in this case the court sentenced Defendant to the highest end of the range. Based on the language of Sampson, it was clear error for the court to do so.

II.    THE    DISTRICT    COURT    COMMITTED    CLEAR    ERROR    IN
DETERMINING DEFENDANT WAS A LEADER, AND ENHANCING HIS
SENTENCE UNDER U.S.S.G.§3B1.1

The District Court overruled Defendant's objection to the Presentence Report recommendation that his base offense level be increased by 2 levels for a leadership role.  This circuit has previously held that before a role in the offense enhancement should be applied, a court should consider seven factors:

> 1) the exercise of decision making authority; 2) the nature of participation in the commission of the offense; 3) the recruitment of accomplices; 4) the claimed right to a larger share of the fruits of the crime; 5) the degree of participation in planning or organizing the offense; 6) the nature and scope of the illegal activity; and 7) the degree of control and authority over other. United States v. Cameron, 573 F. 3d 179, 184 (4th Cir. 2009), citing U.S.S.G.§3B1.1.

Here, however, the court applied the enhancement with only a cursory explanation.  The court found "the evidence is abundantly clear that each of the Defendants were engaged in running this conspiracy together." (Joint Appendix, page 602)  By pleading guilty, both Defendants admitted they conspired together, so the 3B1.1 role enhancement obviously requires more.

16

The court went on to find the Defendants "enlisted Mr. McDonald to do the driving for them," and used witnesses Pemberton and Vinson "to help supply the names of individuals who wanted to buy drugs." (Joint Appendix p. 544)  This could arguably satisfy one of the above seven factors ("the recruitment of accomplices"), but <u>Cameron</u> requires a more detailed analysis.

For example, the evidence here was that both Defendants worked together, sharing a phone, car, apartment, etc. There was no evidence that this Defendant had "decision making authority."  Likewise, there was no testimony, or evidence, that this Defendant claimed a right to "a larger share of the fruits of the crime." Indeed, one of the hallmarks of this case is the complete lack of cash, or assets of any kind.

The Defendants in this matter admittedly engaged in a conspiracy to deliver drugs.  Obviously, as sellers they needed a ready stream of buyers.  But just because Defendant sold drugs, and had fellow co-conspirators, does not make him a leader or organizer.  In <u>United States v. Sayles</u>, 296 F. 3d 219 (4th Cir. 2002), a similar set of circumstances existed.  There, the government "presented evidence from a co-conspirator that both Defendants purchased and sold crack to other participants in the conspiracy.  Furthermore, one of the co-conspirators testified that Sayles was involved in the conversion of cocaine powder to crack.  Based on this evidence, the district court assessed the leadership enhancement…"

17

The <u>Sayles</u> court reversed the §3B1.1 enhancements, holding that "being a buyer and seller of illegal drugs, even in league with five or more other persons, does not establish that a Defendant has functioned as an 'organizer, leader, manager or supervisor' of criminal activity". Id, at 225. To find sufficient evidence to apply this enhancement, a Defendant must have had an "aggravating role… beyond the buying and selling of significant quantities of drugs." <u>Cameron</u>, supra, at 185. Here, the evidence clearly established this Defendant purchased and sold drugs, primarily with other members of the conspiracy. But there was no evidence presented to raise this Defendant's involvement to a leadership role, and it was clear error for the court to enhance under §3B1.1.

CONCLUSION

The district court, by unilaterally inventing a statistical method to arrive at the quantity of drugs sold by this Defendant, committed clear error. The judge specifically rejected the methodology suggested by the government, but created its own version without any basis in fact. The court's entire methodology was based on the faulty presumption that the Defendant went to Columbus "and got at least as much [on subsequent trips] as [he] got the first time." There simply was no evidence upon which the court could base such a statement.

Likewise, the court committed clear error by mistakenly figuring the period over which these trips occurred. The court figures there was a 36 week window,

when actually there were only 32 weeks from the beginning in late October. Similarly, the court erred in holding when the trips ended. The only witness to those events testified he quit sometime between January and March, yet the court based the sentence as if they occurred through June.

Finally, the court committed clear error by imposing a leadership enhancement. Defendant admits he sold drugs, and was involved with several people in doing so. But as <u>Cameron</u> dictates, the court was required to review numerous other factors before deciding this issue, which it failed to do.

Accordingly, this Defendant requests this court find clear error, reverse his sentence, and send this matter back to district court for a re-computation of his relevant conduct.

Respectfully submitted,

<u>/s/ Steven Michael Bragg</u>
Steven Michael Bragg
THE LAW OFFICE OF
STEVEN M. BRAGG
Suite 123
6007 Route 60 East
Barboursville, WV 25504
304) 523-3900
steve@smbragg.com

Counsel for Appellant

19

CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1. This brief  complies with the Type-volume limitation of Fed. R. App. 32(a)(7)(B) because:

   The word count of this brief is  4,381 words.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   This brief has been prepared in a proportionally spaced typeface using Microsoft Word, Times New Roman, 14 point.

July 3, 2013

/s/ Steven Michael Bragg
Steven Michael Bragg
THE LAW OFFICE OF
STEVEN M. BRAGG
Suite 123
6007 Route 60 East
Barboursville, WV 25504
304) 523-3900
steve@smbragg.com

Counsel for Appellant

20

CERTIFICATE OF FILING AND SERVICE

I hereby certify that I have this 3rd day of July, 2013, filed the foregoing Opening Brief of Appellant and Joint Appendix in the Office of the Clerk of the United States Court of Appeals for the Fourth Circuit via hand delivery and electronically using the Court's CM/ECF system which will send notification of such filing to:

> Joseph F. Adams
> Office of the United States Attorney
> 5th Avenue & 9th Street
> Post Office Box 1239
> Huntington, West Virginia 25714
> joe.adams@usdoj.gov
> Counsel for Appellee

July 3, 2013

/s/ Steven Michael Bragg
Steven Michael Bragg
THE LAW OFFICE OF
STEVEN M. BRAGG
Suite 123
6007 Route 60 East
Barboursville, WV 25504
304) 523-3900
steve@smbragg.com

Counsel for Appellant
